The next case on for argument, G-Max Management, Inc. v. State of New York et al. May it please the Court. I'm Randy Mastro of King & Spaulding on behalf of plaintiff's appellants. All small landlords uniquely affected by these amendments to the state's rent stabilization and rent control laws known as the Housing Stability and Tenants Protection Act. Your Honor, this case is different than the other cases that have recently been before this Court challenging rent control. We are not challenging rent control writ large. We are here specifically about these recent amendments and how they take... Well, the previous cases were attacking the law as it was amended. So it is possible that those cases may go in a way that doesn't deal with your issues. But it is also possible that those cases will go based on the amendments. And if they do, then those cases will be binding on us. Now, I'm just telling you that because I was on that panel. I can't tell you. I don't know how those cases will come out. But it is not impossible that even though you are specifically challenging the amendments and they did not, that the two may cover. Absolutely understood, Your Honor. I know Your Honor was on an earlier panel addressing two of those cases. Correct, Your Honor. But the point that I am making, Your Honor, is that we are here specifically about the amendments. We are not challenging rent control or rent stabilization as it existed under prior law. We're challenging specifically the amendments in whole or in part, Your Honor, because of their unique unconstitutional impacts constituting a physical and regulatory taking as well as a due process problem. Now, Your Honors, the fact of the matter is that these amendments admitted by the legislature to have been the most stringent in history. That's what state senators put out as their statement. We're designed to maintain the housing stock for the state. Again, the statements of the state legislatures. In other words- Let me put to you what my basic problem, which will be more with respect to the regulatory taking, because there are other problems with physical taking, and which go to be as applied more than facial. But what my two basic problems are. One, in the cases that both you and VRI have that are most powerful, in your case, the Ordway case, the Ordway-Barriero case, you have not sought the exemptions that the law, the amendments and the law provide. That is, you could say in the Ordway case, immediate necessity, given the coming of the sun and so on. That is, in every case in which the claim is that this is so strong that Penn Central's requirements are violated, you haven't sought an exemption that would keep it from being. This is not the simple, un-exhaustion argument, not right. This is an argument that says, how can we tell if this goes too far, which is what you yourself are saying, that this goes too far, without knowing what would have happened if you had asked for an exemption? Can I just, I'm sorry, I hate to give compound questions, but it's actually related to this and sort of what facts we can determine from the complaint. The complaint, I think, alleges that they were forced to cancel the reclamation proceedings because of the statute. It's not clear to me from the complaint how that's the case. The complaint doesn't say, for instance, that there was, they went to court and they had to stop the reclamation from that. It just kind of makes a, to my mind, fairly conclusory assertion, and so it goes to that same question of, what are the facts that are pleaded in the complaint that show that the statute was responsible for ending the reclamation proceedings? Well, Your Honor, the statute on its face, the amendment on its face, has now limited to reclamation of one unit in a building. And it requires that you make a showing of, quote, immediate and compelling necessity to even get the one unit for your personal use. That exists right now, Your Honors. It's not a question of I can get an exemption to get more units. They're seeking two units, Your Honor, for their personal use. How do we know how they would interpret that? There's a lot of room in that, and your clients haven't looked. They haven't taken even the first step, as the presiding judge has said, of seeing, of continuing to try to get it, let alone then continuing and then asking for the exemption. Because, Your Honor, they gave notices of eviction and then went to court to try to get two units. There's no exemption for two units. The new statute, the new amendment says they can only potentially get one unit. They're trying to connect units for their ultimate retirement, and they cannot possibly get two. As to the one unit, are you saying that the clients can't make a showing of immediate and compelling necessity, or they shouldn't have to make a showing of, or what? No. Your Honor, I'm saying that that's an additional requirement that has been imposed that makes it even harder to get even one unit. It used to be for your personal use, and I think Cedar Point goes right to the heart of this issue, but I will come back to that in a second. It used to be that you could reclaim units for your own personal use, and there was no need to show immediate or compelling necessity. Now, these two folks who want to ultimately retire so there's not an immediate and compelling necessity to convert multiple units, but the law says now, under this amendment, I can only get one unit potentially to reclaim, even though I'm the property owner, and even though the person in one of those units is a wealthy individual and former professional athlete, and they can't get two under any circumstances. We know that already. There's nothing to go to court about. There's nothing to apply for. Well, that's not clear to me from the amendment, but did they make an attempt to get other rental that was suitable for these people, given that these people have money and such rental would be easily gotten? Well, here's the problem, Your Honor. The problem is twofold. Under both Cedar Point and under Regina, New York Court of Appeals, defining retroactivity is a due process constitutional violation as to another part of this statute, but Harris says that in this very context, that is a problem. Harris was farther along in the judicial proceedings. These folks applied before, before they gave the notice of eviction and then they went to court. All right? They were in the process of following the law. Their reasonable expectations under the law were that they could get these two units back, and then in the middle of all of that, the law was changed to say you can only get one unit and only on immediate income. I have another problem, which goes in a way more to BRI, but to some extent happens here. You know, there's much talk about expectations and what it is if you go into a highly regulated industry. I'm not sure that that by itself is enough to cover the problem, but the thing about this highly regulated industry, which is so odd, is that the changes that have been made since the beginning of these laws have been in two directions. Sometimes they've been very favorable to landlords, and sometimes they've been very favorable to tenants. And why isn't in this situation an appropriate expectation as a generic matter that you might get a windfall profit or you might get wiped out? That is, you buy into rent control in New York, and every once in a while the legislature turns it your way and your investment is now worth a huge amount because now you can do anything with rents, as during some times you have been able to. Other times they do what they did here and you lose, and that's standard expectations of people going into business. I'm very glad Your Honor asked that question because I think it goes to two important aspects of how we happen to be here. Unlike the prior case, we're here on a motion to dismiss. I didn't even have a chance for my clients to flesh out this record, show the unique ways that this law is adversely affecting them, and in the case of Ordway and Gureri, to show what they did, what their reasonable expectations were, and why. What do you mean, though, you didn't have the chance to do that? Because it was decided on a motion to dismiss. No, no, but you had the chance in your complaint. In fact, you had the duty in your complaint to plead factual allegations. And Your Honor, I believe that we did, certainly to pass a motion to dismiss. Those two individuals, and this is what the pleading shows, had already taken all of the proper steps under the law to evict the tenant. They were going to take two units. They did it all before this was anywhere on the books. Can I just jump in, though? Sure. I'm still wondering, you say that they started the proceedings, they went to court, and then the statute was passed. And so what I'm wondering, and what doesn't seem to be in the complaint, is what does that mean? So did the court end the proceedings? Did they just change their mind on the basis of, oh, this isn't going to work? That's the gap that I'm wondering about. Well, Your Honor, I think this is pled, and it's absolutely consistent with Regina and Harris that this is a due process, retroactive application, unconstitutional issue. They pled. We're seeking two units. But you're not going to, I guess you're, and you don't have to give me the answer to that. I'm asking a factual question about the pleadings and the fact that you're saying they had these two units. I understand the lead up. They went to court. The statute's passed. But you don't say, once the statute was passed, a judge threw it out in court. Or once the statute was passed, they withdrew the action. That just very factual question is what I'm wondering about. I understand, Your Honor. The answer to the question is the court proceedings could no longer get them what they were seeking. They couldn't get the two units following the same eviction procedure because the statute applied retroactively. And so they withdrew their claim, or the court ruled against them? Your Honor, they didn't have a, they wouldn't have had a good faith basis based on the statute, the amendment to the statute applied retroactively. What specifically happened at that point? I think that's what the presiding judge is asking you, and I'd like you to answer. I understand, Your Honor. My understanding is that they withdrew because they wouldn't have had a good faith basis for continuing the proceedings against the two units. Since the statute, the statute. They withdrew because they thought that under the new statute they'd lose. Correct, Your Honor. But they may have, they may have been wrong. Well, Your Honor. They may have been wrong. Well, the statute, the statute is written. I was not their counsel on that particular proceeding. No, no, I understand. We're not blaming anybody, but how do we know that the statute would have applied to them in that particular way? And you say, well, it reads that way, and so we think. It does. You've practiced in New York long enough to know that the New York courts are not that clear on what a statute means when it says something. I'm not sure the Supreme Court claims to do that is. It was clear as to the second unit in any event, right? It was clear as to the second unit.  There was no question, Your Honor, as to the second unit. They wanted a two-unit resolution. Correct, Your Honor. Absolutely correct. And you couldn't possibly, Your Honors, there's no circumstance under which with the new statute you could have gotten both units. Yet they were proceeding in good faith under the existing regime, and this was applied retroactively. And I think Regina and Harris, subsequent authority, says exactly this in a similar context. That you can't apply that one-unit-only rule for a property owner to reclaim their property to someone who was proceeding in good faith and asserting their rights to reclaim multiple units before this. And Cedar Point, it seems to me, is right on point, Your Honors. It's a classic case, 2021, where the Supreme Court said it is a regulatory taking to say that someone who wants to use their property, they are forced to for a period of days and hours a day allow someone else to use their property by regulation. But there's a distinction, because in Cedar Point we're talking about uninvited individuals. Here, haven't the cases made the distinction of it's different when you're talking about someone opening up their property for rent, and then that's being regulated in some way? That's, to my mind, that's distinct from someone who is not renting, not opening a place up, and then they're being- Didn't want them there, okay? Just like in Cedar Point, they didn't want to give three hours a day to labor organizers for 120 days a year. They held over. In Harris, they had completed and gotten a judgment when the statute passed, but the court recognized that you couldn't apply it retroactively. Here, we've done all of those steps and we're in court, but couldn't, under any construction, get two units under the statute. Let me, since the point was raised about the second unit, do we know that given the coming back of the son, that they wouldn't have felt that there isn't a possibility that immediate necessity might be applied to the second unit for the son? Your Honor, that's not, as we, a plain reading of the amendment. I know you're saying a plain reading of the amendment, but I come back to saying that New York doesn't always read plainly. What I'm saying is that you suggested that as to a second unit, it is absolutely impossible. And I'm asking whether immediate necessity when the son comes back might not conceivably, maybe not the way you would read it, maybe not the way Justice Gorsuch would read it, but the way the New York Court of Appeals might read it or Supreme Court, that it fit in there.  The law is you can only get, the law now as amended, is you can only get one unit. And you have to show immediate and compelling necessity even to qualify to get the one unit. So, no, you couldn't get two units. That's how you read it. Thank you. Okay. Thank you. Thank you. Who may please the court? Esther Merdukayeva for the State Appellees. If the court permits, the interveners have generously ceded two minutes of their time to me. Yes, that's fine. Thank you. The 2019 amendments are changes of a degree, and they do not change. Please talk slowly. Sure. The 2019 amendments are changes of a degree, and they do not alter the takings or due process analyses in this court's many precedents that rejected substantially similar challenges to their unstabilization law. I'll start with Ordway and Garrieri, and I will begin with a fundamental misstatement by counsel for the appellants. Ordway and Garrieri are only seeking to reclaim one unit. This is the paragraphs 168 to 176 of the complaint, where they set out that they own a building with eight units. Five of those are market rate units. Three are subject to the rent stabilization law. Ordway and Garrieri already occupy two, so this is really a dispute about one unit. The one unit limitation in the 2019 amendments serves no material effect on their ability to reclaim the unit. I would also like to answer Judge Lee's question about what ended up happening here. It's not pleaded in the complaint, even though Ordway and Garrieri voluntarily discontinued their action two months before this complaint was filed. And the voluntary discontinuance, which is on the state court docket, and the complaint in that proceeding is attached to our 28J letter, dismisses the proceedings as to the first notice of non-renewal and preserves the right to bring a second notice of non-renewal upon a change in the law. That has legal import. It moots out their substance of due process claim, because there can be no claim of retroactivity about the first notice of non-renewal, given the discontinuance of that proceeding. It also, as Judge Calabresi noted, proves what the district court had stated, which is that there is no final determination that has been made by a state court that Ordway and Garrieri cannot reclaim this unit. They allege in a conclusory fashion that they will not be able to meet the immediate and compelling necessity test, but there is no substantive allegation in the complaint from which this court can draw that inference. And if I may? You're saying that even though they don't think they could meet the immediate and necessary test, that they could? I mean, how do you go to court and make an allegation that you don't think you can make? Well, Your Honor, I think the point is that as applied challenge, they at least have to try because there has to be a determination of finality. Why isn't it sufficient to make a decision that in our judgment we can't meet that test and we are nonetheless being hurt because we're not able to do what we want with our property? Your Honor, I think that's a problem both as to fundamental justiciability for purposes of Article III as well as the rightness. I think probably the appropriate answer to that is you may be able to do that with respect to certain things, but can you make a constitutional claim by saying that we don't believe we would win on a non-constitutional issue, therefore we are making a constitutional claim? And is that a way in which you can make a constitutional claim before a court? I mean, normally courts will not take constitutional claims unless there is, you know, not just a party's belief that they would be maltreated in a constitutional way, but that there's some indication that they have been. That's right, Your Honor. That's an issue of Article III standing and injury in fact as well as an issue of rightness and finality for purposes of a taking claim. I'm not sure I'd call it standing, but whatever. But in any event, to return to the physical takings claims more broadly, the law is well settled that when a landlord voluntarily offers housing to third-party tenants, there cannot be a physical taking because a hallmark of a physical taking is a compelled physical occupation or appropriation. Now, with the exception of Wardway and Garrieri, the remaining appellants do not argue that they wish to exit the rental market. What they argue is that they wish to continue to offer their units for rent, but engage in conduct that has been restricted by the 2019 amendments. But there is no constitutional right to participate in the rental market free from regulation, much less a constitutional right to freeze an owner's preferred form of rent regulation in perpetuity. The appellants have also discussed at length the condominium and co-op conversion provisions of the 2019 amendments, and I'd like to address those briefly. The biggest flaw in their argument is that not a single appellant has actually alleged that they wish to convert their property into condominiums or co-ops and that they have been stymied by the 51 percent requirement from doing so. The 51 percent requirement is simply a threshold. It's a variation on a threshold that has existed for tenant approvals in the Martin Act for years. It used to be 15 percent? It used to be 15, and prior to that it was 35. And the appellants do not challenge the legislature's right to set a threshold. One of my concerns is that this was on a 12b-6, and if the plaintiffs argue that it wasn't feasible for us to do this, I mean, why shouldn't that be assumed to be true for purposes of the motion to dismiss? Well, Your Honor, I think most importantly, none of the appellants have argued that they even wish to do it. Feasibility is a separate inquiry from whether the appellants actually wish to engage in this form of conversion, and absent the desire to actually avail themselves of this exit ramp, there cannot be a- I mean, that could be a pleading thing, but, I mean, assuming they wanted to, they're saying it's not practical, there's no way we can get it done as a practical matter. Shouldn't that be assumed to be true for purposes of the 12b-6 motion? Your Honor, the Supreme Court's decision in Yee really squarely forecloses that argument. The challengers in Yee made the exact same point. They said that the exit paths were slow, uncertain, and expensive, or a form of a gauntlet that would be subject to approvals from zoning agencies or other third parties, and the Supreme Court rejected that facial physical takings challenge and held that the availability on the face of the statute of those exit ramps foreclosed the facial- Well, and some of the case law says if a regulation goes too far, then it might be a taking or a due process violation. And, again, there are all these allegations about these regulations going too far. I mean, what do we do with that on a 12b-6? Well, Your Honor, the going too far statement is not actually the legal standard. It is an articulation or a summary of the regulatory takings framework under Penn Central, and Penn Central has said- But the argument here, particularly with the elimination of the sunset provision, is that this set of regulations goes too far, but that fails as a matter of law. It does fail as a matter of law, Your Honor, because the elimination of the sunset provision is to the enabling act. What the elimination- Here is- I said to the opposing counsel that the other part of Penn Central, which had to go with going too far also deals with expectations, and expectations are both in this context of a windfall profit and of a terrible loss, and that may apply to most of these instances where the question is, can I make more money by converting more easily or do I not? But when we're talking about old way, what is- It's harder for me to see the expectation that windfall profit, as again, windfall loss might be there. That is, that case looks a bit different in terms of that, and I wondered if you could address that. The notion generally that I might buy a building, think I can convert it into condominiums and make a lot of money, and hope that it goes from 15 to 5, and instead it goes to 51, and that's the chances I take. I can understand, but in the old way case, it's a little more difficult. Well, Your Honor, I think appellants misrepresent the prior version of the personal use provision as being an ability to evict a tenant as of right at any time for any use in an unlimited number of settings. That is not what the provision previously allowed. Under the prior law, a landlord could only evict a tenant to reclaim the property for personal use if they could show that in good faith that would be a primary residence for the owner or for a member of the owner's immediate family. And there were additional restrictions on types of tenants that could not be evicted under this provision. So it was not a free-for-all ability to evict tenants at any time in order to reclaim the property for personal use. There were restrictions in place. I agree the 2019 restrictions are more stringent, but the fact that there were restrictions in place on this particular exit ramp in the past means that additional changes to those restrictions certainly do not constitute a physical taking, and they do not go too far in the way that is material to the regulatory takings analysis. Thank you, Your Honors. Thank you. Thank you, Your Honors. May it please the Court. Michael Duke from Selene Gay Ellsberg, along with co-counsel from the Legal Aid Society, on behalf of Intervenor Appelese, Community Voices Heard, and New York Tenants and Neighbors. I want to talk about a few things that you haven't heard from Alan today. First, you heard nothing about the impact on the tenants here. There are 2.5 million people that are protected by the rent stabilization laws. That's 44% of the housing stock in New York City. 86% of those individuals are low to moderate income, with the vast majority— Yes, that's all very well, but that doesn't allow somebody to take property for the benefit of those people. So, you know, the fact that this is a law that has all sorts of benefits is all very well, but to benefit those people, I could not simply go and take a park, take somebody's property, and make that into a park or something for their benefit. So, you know, everything benefits some people. There is a claim here that it doesn't, but that's not a really strong claim. You know, that's nice, but you can't take property for the benefit of people without paying for it. Your Honor, thank you for raising that point. I think where it really goes to with respect to regulatory takings claim is investment-backed expectations. As the Supreme Court in common was clear, you can't claim surprise when a law is changed to buttress— sorry, is buttress to achieve the legislative end. And what happened here is we have people that depend on these laws— Look, I have made the point that this isn't only you're going into a regulated industry, but it's a regulated industry that has sometimes gone one way and sometimes gone the other. So the speculators are there hoping that it will go their way. But what I'm interested in is the particular cases that they are alleging where that would be harder to show that there was this kind of expectation of possible windfall. And the Ordway case is the strongest case they have on their side because there it's harder for me to see what the windfall profit would have been. That it is regulated, I agree, but I don't quite see what the windfall profit there would have been. Your Honor, first of all, I want to say that I agree with the arguments that the State has made today, so I won't reiterate those points unless Your Honor would like me to. The way to assess that claim is to run it through the Penn Central analysis. And what you have to do is you have to look at the economic impact, you have to look at the investment-backed expectations, and you have to look at the character of the change. And the investment-backed expectations are governed by the rules that were on the books when they purchased these properties. And again, this is a highly regulated industry. This is just a change that was buttressed to achieve the legislative end to avoid displacement of tenants. And with respect to the character of the change, or excuse me, with the character of this issue, this isn't an instance when landlords are prohibited from occupying their properties or anything along those lines. It is a restriction on the ability to evict tenants, to kick them out of their homes. And what the Supreme Court has made clear is that once you enter into the landlord-tenant relationship, that relationship can be regulated. So again, I think this all goes to the analysis under the Penn Central test. I want to turn very briefly. I see I'm out of time. If I can just very quickly hit the second point I wanted to make, which is that you haven't heard and you haven't seen alleged a single fact about actual profit, actual loss, actual purchase price, or the actual current value of any of the properties that these landlords own. Just conclusory rhetoric, without any factual allegations, the HSTPA simply doesn't transform the rent stabilization laws. It closes loopholes that were being exploited to harm tenants. And make no mistake, there was no constitutional right to these loopholes. Unless the panel has further questions, I'll rest my briefs. Thank you. Thank you. Your Honor, just to clarify, State's counsel, I think, misspoke. Our clients had already, this is Ordway and Greary, paragraph 171 of the pleading. I'm sorry, I couldn't hear. Paragraph 171 of the pleading. They had already converted one unit. They'd been able to under the old statute get a unit out of rent control. This was a second unit that they were trying to get out of rent control so they could unite their original unit, the one they had already taken, and a second unit off of rent control. So it is two units that they were talking about in this conversion. And in paragraph 170, they explain all the money that they spent and the expectations that they had to effectuate this eventually. So I just wanted to make that clear. And it is the case that they had done all the things the right way under the statute previously. They had, for personal use, they'd been able to take one unit. There's nothing about how in the prior regime there were no restrictions. They complied with the prior regime. The new regime applied retroactively to them in the middle of a process. And, yes, I did say that at that point they withdrew because they realized they couldn't get the second unit under this law. Your Honors, I wanted to speak briefly about the condo co-op 51%. This is a motion to dismiss. We didn't have the chance to develop that record at all to show what we believe will be the case, that it's virtually impossible now to do a co-op condo conversion, particularly on a rent-controlled apartment. If their withdrawal was premature, and I hear you argue that it was not, and that's a question of whether their belief that they couldn't win was enough. You know, we've talked about that before. But if their withdrawal was premature, then 12b-6 would be okay. If it wasn't, you know, I hear your argument, but if their withdrawal was premature, then there's nothing wrong with saying this is no longer a factual issue. So, Your Honor, I think that that still wouldn't be, it would be premature to decide that question. I think the Sutem case is instructive here where, you know, the law is clear on its face, you know, the issue exists. I'm arguing again that their withdrawal was necessary given what the law said. And if you win on that, then we get to the 12b-6. But what I'm saying, if we say that it is possible that New York would have read two units to mean one unit when you were converting them together and your son has returned or so on, which you're telling me that they couldn't do, but if that is possible, then, and that the court said withdrawal was premature, that would be an issue that could be decided at 12b-6. I understand Your Honor's point. I'm not saying it is that way. Yes, and I will simply say, Your Honor, that, you know, we believe the law was clear and was clear to all. And the constitutional point here under Regina, and rules that got established later through Regina and through Harris later, that the retroactive application in this context of this statute, which would have affected this result, okay, that that is unconstitutional under the Due Process Clause because of its retroactive application. And, Your Honor, I just, on the Cobb condo conversions, I think this is an important point. There were multiple appellants, including Gateway and Green Valley and Van Cortland, who said they thought it would be appropriate for their properties to be able to be convertible, that that was something in their thinking because it had always been able to be done at a reasonable level. But at 51 percent, it's now impossible. And I believe we will prove that if we have the right to go forward. Right, but I guess I'm still focused on sort of the pleading aspect of this. In terms of the notion that the 51 percent conversion rate is effectively impossible, it's enough for you just to say at the pleading stage, well, we can't do it with 51 percent. You don't have to have more specific allegations than that. I think for purposes of a notice pleading in this context, small property owners who say they invested in their properties and they expected, thought it was appropriate that their properties could be converted at some point in a co-op condo conversion at either 30 percent or 15 percent, which was the state of the law just before this new amendment passed. Suddenly it goes to 51 percent. And you're honest, 51 percent. They can say, well, we can't do that now. They don't have to allege, here's a survey I did with the tenants, and in fact this person has said that they wouldn't convert. All they have to allege is that this number is so high that, oh, we can't do this now. I don't believe they do, Your Honor, because the impact of the law is felt immediately, the 51 percent. We believe that discovery will show the 51 percent has basically ended co-op condo conversions. But when you come back to that, you come back to my thing. People have bought into this. When it was 15, when it was 30, now it's 51. If it goes to 12 to 2, they make a lot of money. If it goes from 30 to 51, they lose money. How can you say that this is the kind of destruction of expectations that Penn Central was talking about when this is the essence of speculation? It's sometimes you win and sometimes you lose. So, Your Honor, it isn't the essence of speculation. And what have these laws been based on for decades? They've been based on the following premise, that these were voluntary programs, that they would be temporary, have sunsets and have to be renewed, and that they would provide a path of deregulation. How can any reasonable investor expect that what was said about the end of rent control, which is a wise thing to say and would have been wiser, I think, if it had been done, would be something that would come about in New York? I mean, any reasonable investor, and indeed people have been investing that way for a long time in New York, would know that this is there to stay and sometimes it comes my way and sometimes it goes the other way. Your Honor, I am simply trying to say that the three legs of the stool that have been consistently a part of the legislative and constitutional support for this system existing for decades have been that it's voluntary, so therefore regulation is appropriate, that I am saying temporary, Your Honor, in the sense that there are sunset provisions and it has to be re-upped and there has to be an evaluation by the legislature periodically, sunset provisions now repealed, and that there's a path to deregulation. That has been said in every statute, including this one. But, Your Honor, Penn Central says, and so many of these cases say, Lingle and Mahon and Palazzo, they all say, hey, but when you go too far, when you go too far, and here, reasonable expectation is that that's ultimately the goal, that there's going to be some path to deregulation. For me to be able to use it personally, that's what Cedar Point says I should have a right to do. And, Your Honor, the point is these provisions go too far. We're not saying get rid of rent control, writ large. We're saying these provisions go too far, and I didn't even have the chance to prove it because I lost on a motion to dismiss, and that's not right. I should have the chance to prove my case. Thank you, Your Honors. Thank you. All right. We'll take this case under advisement.